| | |
|---|---|
| In re: | ) Case No. 24-43778-mlo |
| | ) |
| INTERACTIVE HEALTH BENEFITS LLC, | ) Judge Maria L. Oxholm |
| d/b/a ACA Track, LLC, | ) |
| | ) Chapter 11 |
| Debtor. | ) *Subchapter V* |
| | ) |

## DECLARATION OF TODD COVERT IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Todd Covert, under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the sole member of and Chief Executive Officer of Interactive Health Benefits LLC d/b/a ACA Track, LLC (the "Debtor"), a Michigan limited liability company.  I have been the Chief Executive Officer of the Debtor for more than 9 years and am duly authorized to make this declaration (this "Declaration") on the Debtor's behalf.  If called upon to testify, I would testify competently to the facts set forth herein.

2.      On the date hereof, (the "Petition Date"), the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 ("Bankruptcy Code").  The Debtor is operating its

business as a debtor in possession pursuant to section 1184 of the Bankruptcy Code.

3.     Except as otherwise indicated, all statements set forth in this Declaration are based upon: (i) my personal knowledge as the sole member and Chief Executive Officer of the Debtor; (ii) information supplied to me by the Debtor's agents or attorneys; (iii) my review of the Debtor's relevant documents or books and records; and/or (iv) my experience and knowledge of the Debtor's financial condition, business operations, and financial affairs.

4.     The motions filed concurrently herewith (the "<u>First Day Pleadings</u>") are intended to enable the Debtor to operate efficiently and effectively during this chapter 11 case, as well as to avoid certain adverse consequences that might otherwise result from the commencement of the chapter 11 case.  Among other things, the First Day Pleadings seek relief aimed at sustaining the going concern value of the Debtor.  I also believe that, absent immediate relief as sought under and described in greater detail in the First Day Pleadings, the Debtor would suffer immediate and irreparable harm to the detriment of the bankruptcy estate and its creditors.

5.     To enable the Debtor to operate effectively and to minimize certain of the potential adverse effects of the commencement of this chapter 11 case, the Debtor has requested certain relief in the First Day Pleadings.  Among other things,

the First Day Pleadings seek relief that would (i) allow for the continued payment of wages and withholding tax obligations; (ii) allow for the continued payment of certain tax obligations; and (iii) ensure the continuation of the Debtor's cash management system and other business operations without interruption. Each of these aforementioned items is necessary for the Debtor to achieve a successful reorganization, as the relief requested therein will maintain employee morale and confidence and preserve and maximize the value of the Debtor's estate.

6.     If called to testify, I can and will testify to the facts set forth in this Declaration. I am authorized by the Debtor to submit this Declaration. I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to: (i) avoid immediate and irreparable harm to the Debtor's business; (ii) avoid disruption or loss of productivity or value; and (iii) maximize and preserve the value of the Debtor's bankruptcy estate. Unless otherwise indicated, the financial information contained herein is unaudited and subject to change.

## I.     <u>**Background**</u>

7.     The Debtor filed its case as a means to maintain the going concern value of its business, preserve employment, avoid a piecemeal liquidation of its assets, and file a plan of reorganization to maximize value for stakeholders. This section of the Declaration provides an overview of the Debtor's business, a description of the Debtor's debt, an explanation of the reasons for the filing of the

chapter 11 case, and a roadmap for how the Debtor plans to achieve its goals through this process.

## II.    Overview of the Debtor's Business

8.    The Debtor is an industry leader in providing Internal Revenue Service and State Individual Health Mandate reporting services to large employers in accordance with the requirements of the Affordable Care Act.  The Debtor implements its proprietary software to assist its customers in meeting their federal and state reporting obligations on a yearly basis and collects data over the course of the year to conduct necessary audits.

9.    The Debtor enters into agreements with employers to provide this service on an annual basis, and it bills customers for these services quarterly.  The Debtor generates revenue through quarterly invoices, which are paid in advance for services performed at year-end.  The revenue received throughout the year is used to pay the Debtor's ongoing business expenses.

10.    The Debtor was organized in Michigan on December 3, 2013.  The business has been operating since 2014.  The Debtor's business is run remotely.  It has no physical office space.  The Debtor is managed by Todd Covert, Chief Executive Officer, and Christine Covert, Chief Financial Officer.  The Debtor employs twenty employees and three independent contractors, all of whom work from home.

33409171.8

## III. Financial Overview of the Debtor and Events Leading to Bankruptcy

11. The Debtor has historically been profitable. The debtor had total revenue of more than $5,000,000.00 in 2022 and 2023. As of April 16, 2024, the Debtor had total assets of approximately $1,252,954.00 (which includes approximately $200,000.00 in receivables) and total liabilities of approximately $2,500,000.00. Based on past performance, the Debtor is expected to generate approximately $1,200,000.00 annually in excess cash flow.

12. As of the Petition Date, the Debtor has no secured debt and minimal undisputed, unsecured debt. The Debtor has historically been able to pay its debts as they come due.

13. The Debtor has been involved in litigation since 2022 with a former employee, Jerry Dagenais, relating to claims with respect to a breach of an employment contract.[1] On January 17, 2024, after a jury trial, a judgment (the "Judgment") was entered in favor of Mr. Dagenais and against the Debtor in the amount of $2,481,882.53 (the "Judgment Amount").

14. On March 25, 2024, after various post-trial motions, the Debtor filed a claim of appeal. The Debtor has been advised that it has a strong basis for success on appeal.

---

[1] *Jerry Dagenais v. ACA Track, LLC, et al.*, Case No. 2022-193587-CB, Oakland County Circuit Court, State of Michigan (J. Warren).

33409171.8

15.     The Debtor does not have a business liability insurance policy that covers the Judgment.  The Debtor does not have sufficient cash available to fund the full bond amount to obtain a stay pending appeal.  Mr. Dagenais, through counsel, has indicated that he will begin to pursue collection efforts while the appeal is pending.  If Mr. Dagenais takes action to garnish the Debtor's bank accounts and/or its accounts receivable, the Debtor will not have any cash available to fund operations and will need to immediately cease doing business.  After accounting for the Judgment, in the event that the Debtor is not successful on appeal, the Debtor will become balance sheet insolvent.

16.     The Debtor, through counsel, engaged in discussions with Mr. Dagenais's counsel regarding potential options for a consensual resolution with respect to a reduced bond amount and a stay on collections pending appeal. Despite these efforts, the Debtor and Mr. Dagenais were unable to come to agreeable terms.  According, the Debtor's last resort was to file this case.

**IV.     Plan for the Chapter 11 Case**

17.     The Debtor intends to use the chapter 11 process to file a plan of reorganization, pursuant to which it intends pay all of its creditors (including Mr. Dagenais, in the event that the appeal is unsuccessful) the total amount of its disposable income during the pendency of the plan.  The Debtor will propose that the portion of the plan payments to be paid to Mr. Dagenais with respect to the

Judgment claim would be deposited into an escrow account pending the outcome of the appeal. After resolution of the appeal, if the Debtor is unsuccessful, the escrowed funds would be disbursed to Mr. Dagenais, and the Debtor would pay all additional plan payments directly to Mr. Dagenais thereafter.

## V. **Facts in Support of the First Day Pleadings**

18. Concurrently with the filing of the chapter 11 case, the Debtor has filed a number of First Day Pleadings,[2] each of which is described briefly below. I have reviewed each of the First Day Pleadings (including the exhibits thereto), and I believe that the relief sought in each of the First Day Pleadings: (i) is necessary to enable the Debtor to operate in chapter 11 with a minimum of disruption; and (ii) constitutes a critical element in maintaining the value of the Debtor's assets during the chapter 11 process. The Debtor anticipates that the Court will conduct a hearing soon after the commencement of the chapter 11 case (the "First Day Hearing") where the Court will hear and consider the First Day Pleadings.

19. Generally, the First Day Pleadings have been designed to meet the primary goal of continuing the Debtor's operations postpetition in a manner that will minimize any potential impact on the Debtor's business. As such, the First Day Pleadings seek to: (i) protect the Debtor's employees and other parties in

---

[2] Capitalized terms used in the descriptions of the First Day Pleadings and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings. The descriptions of the First Day Pleadings contained herein are only intended to be summaries.

33409171.8

interest; (ii) maintain the Debtor's operations and businesses throughout the chapter 11 case; and (iii) efficiently administer the bankruptcy case.

**A.      First Day Motion of Debtor for an Order Granting Additional Time to File Schedules and Statements (the "<u>Extension Motion</u>")**

20.      I understand that the Bankruptcy Code and Bankruptcy Rules require the Debtor to file with the Court within 14 days of the Petition Date: (i) its schedules of assets and liabilities; (ii) its statements of financial affairs; and (iii) its lists of executory contracts and unexpired leases, among other documents (collectively, the "<u>Schedules and Statements</u>").

21.      By the Extension Motion, the Debtor seeks entry of an order extending the time for filing the Schedules and Statements for an additional 14 days (for a total of 28 days from the Petition Date), through and including May 14, 2024.

22.      The Debtor is filing the Extension Motion because it has numerous customers, creditors, and other interested parties, and the Debtor requires additional time to accurately review and report all of the required information. Given the current state of its businesses, the Debtor has not had ample opportunity to gather all of the necessary information to prepare and file its Schedules and Statements.  The Debtor has commenced the task of gathering the necessary information to prepare and finalize the Schedules and Statements, but Debtor believes that the 14-day automatic extension of time to file such Schedules and

8

Statements provided by Bankruptcy Rule 1007(c) is not sufficient to permit completion of the Schedules and Statements.

**B.     First Day Motion of Debtor For an Order Authorizing: (A) Payment of Prepetition Employee Wages, Salaries, and Other Compensation; (B) Reimbursement Of Prepetition Employee Business Expenses; (C) Payments For Which Prepetition Payroll and Tax Deductions Were Made; (D) Payment to Third Parties of All Costs and Expenses Incident to The Foregoing Payments and Contributions; and (E) Applicable Banks and Other Financial Institutions To Honor and Pay All Checks and Transfers Drawn on The Debtor's Payroll Accounts To Make The Foregoing Payments (the "Employee Motion")**

23.     The Debtor employs twenty employees, ten of which are full time, salaried employees, and ten of which are part-time, hourly employees, and three independent contractors (the "Employees").

24.     The Employees' skills, knowledge, and understanding of the Debtor's business are the Debtor's most valuable asset.  Without the continued services of the Employees, an effective reorganization of the Debtor will not be possible.

25.     To preserve its most valuable assets, to minimize the personal hardship that the Employees will suffer if prepetition employee-related obligations are not paid when due or as expected, and to maintain morale and an essential workforce during this critical time, the Debtor, by the Employee Motion, seeks authority, in accordance with its stated policies, to: (a) pay all prepetition wages, salaries, and other compensation owed to the Debtor's Employees, subject to specified caps; (b) reimburse all prepetition business expenses to Employees,

subject to specified caps; (c) make all payments for which prepetition payroll and tax deductions were made, subject to specified caps; (d) pay all third-party costs relating to the foregoing payments and contributions; and (e) authorize and direct applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtor's payroll accounts to make the foregoing payments (collectively, and as more fully described below, the "<u>Employee Wages and Benefits</u>"). The Debtor believes it has accurately estimated the amount of outstanding prepetition wages and benefits identified herein. However, to ensure the Employee Wages and Benefits are paid in full, and to prevent additional hardship to the Debtor's employees, the Debtor seeks authority to pay no more than 25% in excess of each of the estimated amounts of the following outstanding prepetition obligations that are defined or described below in this Motion (hereinafter, the "<u>Cap</u>").

26. The Employee Motion does not seek to alter the Employees' compensation, paid time off, or other policies at this time. The Employee Motion is intended only: (i) to permit the Debtor, in its sole discretion, to make payments consistent with the Debtor's existing polices to the extent that, without the benefit of an order approving the Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code; and (ii) to permit the Debtor, in its discretion, to continue to honor its practices and policies with respect to its

33409171.8
24-43778-mlo    Doc 5    Filed 04/16/24    Entered 04/16/24 21:33:06    Page 10 of 27

Employees, as such practices and policies were in effect as of the Petition Date. Continued payment of all of the obligations detailed in the Employee Motion in accordance with the Debtor's prepetition business practices is in the best interest of the Debtor' estate, its creditors, and all parties in interest, and will enable the Debtor to continue to operate its business in an economic and efficient manner without disruption.

### a. Wages, Salaries, and other Compensation

27. As of the Petition Date, the Debtor's average gross monthly compensation for its Employees, including all wages and commissions, is approximately $137,900.00 ("Wages"). Substantially all payroll payments are made via direct deposit through a payroll service directly to the Employees. All Employees are paid every other week on Friday (each a "Pay Day"). The Debtor's next scheduled Pay Day is April 26, 2024, which will cover the period through April 8, 2024 through April 21, 2024.

28. Because the Debtor's Employees are paid in arrears, as of the Petition Date, the Debtor's Employees have not been paid all of their respective prepetition wages.

29. As of the Petition Date, the Debtor believes that the aggregate amount of accrued wages (excluding the Payroll Taxes and Deductions) earned prior to the Petition Date that remains unpaid to the Debtor's Employees is approximately

33409171.8

$40,000.00 (the "Unpaid Wages").   By this Motion, the Debtor requests the authority to pay all such Unpaid Wages to its Employees in the ordinary course of business, subject to the Cap.  The Debtor has made careful inquiries and has taken diligent steps to ensure that its Employees are not owed more than $15,150.00 for Unpaid Wages as of the Petition Date.  Accordingly, if this Motion is granted, the Debtor is confident that no Employee will be paid more than $15,150.00 for such Unpaid Wages.

**b.    Reimbursable Expenses**

30.    Employees may occasionally incur expenses on behalf of the Debtor in the scope of its employment (the "Reimbursable Expenses").  The Reimbursable Expenses include, but are not limited to, mileage driven for business travel, fuel, and office supplies.

31.    Reimbursable Expenses are incurred on behalf of the Debtor by Employees through use of personal funds or credit cards.  In the normal course of business, such Employees are reimbursed in the payroll cycle following a reimbursement request.

32.    In the aggregate, Employees incur an average of approximately $0.00 - $1,000.00 in Reimbursable Expenses every month.  The Debtor estimates that as of the Petition Date, there are no Reimbursable Expenses have been incurred but remain unpaid.

33409171.8

33.     However, to the extent there are incurred but unpaid Reimbursable Expenses prior to the Petition Date that have not yet been accounted for, those Reimbursable Expenses were incurred on the Debtor's behalf and with the understanding that they would be reimbursed.  To preserve the relationships it enjoys with the Employees at this critical time, and to avoid harming the individual Employees who incurred the Reimbursable Expenses on its behalf, the Debtor requests authority to pay all unpaid Reimbursable Expenses that accrued prepetition or relate to the prepetition period, up to $250.00, subject to the Cap.

### c.     Paid Time Off

34.     The Debtor pays the Employees for two to three weeks of Paid Time Off ("PTO") per year, which is accrued throughout the year on each pay period, depending on the individual Employee's tenure with the Debtor. Employees are eligible for PTO after they have been employed for 180 days with the Debtor. Offering PTO is usual, customary, and necessary if the Debtor is to retain qualified employees to operate its businesses.

35.     The Debtor seeks authority to honor, in the ordinary course of business, all liabilities to its Employees that arose under their PTO policies or practices prior to the Petition Date.  The Debtor anticipates that most Employees will utilize their accrued PTO in the ordinary course of business and that there is

not likely to be any material cash flow requirements beyond the Debtor's normal payroll obligations.

### d. Withholdings, Payroll Taxes, and Deductions

36. The Debtor is required by law to withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes, and social security and Medicare taxes (collectively, the "Tax Withholdings") for remittance to the appropriate federal, state or local taxing authorities. The Debtor must then match, from its own funds, for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (together with the Tax Withholdings, the "Payroll Taxes").

37. The Debtor's current monthly Payroll Taxes total approximately $8,700.00, which is included in the Wages figure above. The Debtor's Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authorities at the same time Employee payroll checks are administered. As of the Petition Date, the Debtor estimates that the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes are approximately $4,350.00. The Debtor seeks authority to honor and process the prepetition obligations with respect to the Payroll Taxes, including forwarding the Tax Withholdings, subject to the Cap.

33409171.8

### e. Insurance and Disability Programs

#### i. Life and AD&D Insurance Programs

38.     The Debtor provides Eligible Employees life and accidental death and dismemberment insurance coverage (the "Life and AD&D Insurance") through Mutual of Omaha. The total cost of the Life and AD&D Insurance to the Debtor is approximately $282.66 per month. For the avoidance of doubt, all administration costs on account of the Life and AD&D Insurance Programs are included in the monthly premium costs. As of the Petition Date, the Debtor estimates that the amount of accrued but unpaid obligations on account of the Life and AD&D Insurance is $141.33.

#### ii. Disability Benefits

39.     The Debtor provides Eligible Employees with short- and long-term disability benefits (the "Disability Benefits" and, together with the Life and AD&D Insurance, the "Life Insurance and Disability Programs") administered by Mutual of Omaha. Under the short-term disability benefits program, Eligible Employees are entitled to, among other things, salary continuation of up to sixty percent (60%) of their pre-disability, up to a maximum of $1,000.00 per week, for up to 11 weeks. Payments on account of the Disability Benefits are made out of the Debtor's ordinary payroll processing. The length of short-term disability benefits

provided is based on insurance carrier approval and the applicable Employee's tenure with the Debtor.

40. Under the long-term disability benefits program, Eligible Employees are entitled to, among other things, salary continuation of up to sixty percent (60%) of their pre-disability earnings, up to a maximum of $6,000.00 per month based their pre-disability earnings, in the event of a long-term medical disability due to illness or injury.

41. As of the Petition Date, the Debtor estimates that the amount of accrued but unpaid obligations on account of the Disability Benefits is $259.00. The Debtor seeks authority, but not direction, to pay all prepetition amounts due under the Disability Benefits and to continue the Disability Benefits on a postpetition basis in the ordinary course of business.

**f.    Workers' Compensation Program**

42. The Debtor maintains workers' compensation insurance for its Employees at the statutorily required level for each U.S. state in which the Debtor has Employees (collectively, the "Workers' Compensation Program"). The Debtor maintains coverage for the Workers' Compensation Program through Accident Fund. Additionally, the Debtor utilizes Legacy Partners to administer the Worker's Compensation Program and ensure that the Debtor is in compliance with all applicable state laws. The Debtor pays approximately $1,323.00 in premiums,

16

expenses, and fees quarterly to maintain the Workers' Compensation Program. By this Motion, the Debtor seeks authority, but not direction, to pay accrued but unpaid prepetition amounts related to the Workers' Compensation Program, continue and maintain the Workers' Compensation Program in the ordinary course of business, and modify the automatic stay to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable. As of the Petition Date, the Debtor believes that there is approximately $689.00 in accrued and unpaid premiums and fees on account of the Workers' Compensation Program.

g. **401(k) Plan**

43. The Debtor provides all Eligible Employees who have been employed for at least three months, the ability to participate in a 401(k) defined contribution program (the "401(k) Plan"). Historically, the Debtor has matched one-hundred percent (100%) of the first one percent (1%) of Employees' contributions and fifty percent (50%) on the next five percent (5%) of the Employees' contributions to their 401(k) accounts, up to three and one-half percent (3.5%) of the Employees' salary. The 401(k) Plan currently is administered by Great Lakes Pension and all administrative costs associated with the 401(k) Plan are deducted from the assets contributed by the Employee. The 401(k) Plan allows Employees to make both pre-tax and Roth contributions in amounts up to the maximum amount allowed by the IRS. Each Employee's contributions under the 401(k) Plan are automatically

deducted from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions"). The Debtor's matched contributions are funded bi-weekly, on Pay Days. As of the Petition Date, the Debtor estimates that it has incurred $4,000.00 in accrued but unpaid 401(k) Plan remittance obligations.

44. Many Employees' retirement savings solely consist of the 401(k) Plan. As such, the Debtor believes that continuing the 401(k) Plan is essential to maintaining Employee morale and protecting Employee expectations. The Debtor seeks authority, but not direction, to pay any 401(k) Deductions and any match contributions in the ordinary course of business and consistent with past practice on a postpetition basis.

**C.   First Day Motion of Debtor for an Order (I) Authorizing Continued Use of Existing Cash Management System, (II) Authorizing Maintenance of Existing Bank Account, and (III) Authorizing Continued Use of Existing Business Forms (the "Cash Management Motion")**

45. In the Cash Management Motion, the Debtor is seeking entry of an order: (i) authorizing the continued use of its existing cash management system (the "Cash Management System"), (ii) authorizing the maintenance of its existing bank accounts (the "Bank Accounts"), and (iii) authorizing the continued use of existing business forms. I have been informed that the Operating Guidelines and Reporting Requirements for Debtor in Possession and Chapter 11 Trustees promulgated by the Office of the United States Trustee require that a debtor,

among other things: (i) close all bank accounts and open new debtor in possession bank accounts; (ii) establish a separate debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; and (iii) obtain checks for all debtor in possession accounts which bear the designation "Debtor-In-Possession," the bankruptcy case number, and the type of account. The relief requested in the Cash Management Motion is designed to maintain the status quo and avoid any significant disruptions to the Debtor's operations.

46. The Debtor's Cash Management System includes two Bank Accounts. The Bank Accounts are maintained at Fifth Third Bank, N.A. ("Fifth Third"): (i) a business checking account (with an account number ending in 9485); and (ii) a business money market account (with an account number ending in 4126). Prior to the Petition Date, the Debtor had a third bank account, a business money market account maintained by Mi Bancorp, Inc. (with an account number ending in 6622), which was closed on April 1, 2024. The Bank Accounts are used to manage payments received from customers and to make disbursements, including payments to vendors, among other payments. The Bank Accounts are primarily utilized by the Debtor to manage payments from customers, and to make disbursements, including vendor payments, payroll, and employee benefits.

47. The Debtor's continued use of the Bank Accounts is critical to a successful restructuring and a seamless transition to operation as debtor in

possession. Without continued use of these Bank Accounts, the Debtor could experience disruption in its operations and other cash transactions that happen on a daily basis.

48. The Cash Management System described above constitutes customary and essential business practices, and it is similar to those commonly employed by entities of comparable size and complexity. The Cash Management System allows the Debtor to control and monitor funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balances and presentment information.

49. It would be burdensome for the Debtor to establish an entirely new Cash Management System and Bank Accounts. Any disruption of the Debtor's accounting and cash management procedures would be cumbersome and costly to the Debtor's operations and could have an adverse impact on the Debtor's efforts to reorganize.

50. To avoid substantial disruption to the Debtor's business, the Debtor also seeks authority to continue using the Bank Accounts on a postpetition basis. Allowing these accounts to be maintained with the same account numbers will assist the Debtor in making a smooth transition to operating under subchapter V of chapter 11 and ensure that the Debtor's cash flow is not interrupted.

33409171.8

51. The Debtor will be subject to certain administrative burdens and expenses that would prove distracting for the Debtor's management in the early, critical stages of the Debtor's reorganization process if the Debtor is required to close each of the Bank Accounts, open new accounts, and create an entirely new system of accounts for issuing checks and paying postpetition obligations. Accordingly, to avoid these burdens and expenses, the Debtor requests authority to continue using the Bank Accounts, and further, that the Bank Accounts be deemed "debtor-in-possession" accounts.

52. The Debtor uses the Business Forms in the ordinary course of its business. By virtue of the nature and scope of the business in which the Debtor is engaged, and the number of customers and suppliers with whom the Debtor transacts business, it is important for the Debtor to continue using the Business Forms without alteration or change. To prevent unnecessary delay, confusion, and accrual of further expense to its estate, the Debtor requests that the Court waive any requirement of adding a "Debtor-in-Possession" legend or number to the Business Forms other than checks. The Debtor will begin using a "Debtor-in-Possession" stamp or legend for all checks as soon as possible.

53. The Bank Accounts maintained by the Debtor are not maintained in a high-risk or volatile investment. Rather, they are standard accounts at Fifth Third, which is a highly regarded, solvent, insured and bonded financial institution.

33409171.8

**D.** **First Day Motion of Debtor for Entry of an Order (i) Authorizing Debtor to Pay Certain Prepetition Taxes and Related Obligations and (ii) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Prepetition Taxes and Related Obligations (the "Taxes Motion")**

54.     In the ordinary course of business, the Debtor is subject to various taxes, regulatory fees and assessments, and related obligations (collectively, the "Taxes") that are payable directly to various taxing authorities (collectively, the Taxing Authorities"). The Debtor seeks authority to pay various unpaid taxes, fees, and related obligations that accrued or assessed before the Petition Date, up to a maximum of $3,000.00.[3]

55.     Certain state and local Taxing Authorities require the Debtor to pay franchise taxes (collectively, the "Franchise Taxes"). In various jurisdictions, the Debtor pays such taxes to state and local governments in order to remain in good standing for purposes of conducting business within the state. Generally, the Debtor remits such Franchise Taxes to the Taxing Authorities annually, and they are due in May. The Debtor estimates that, as of the Petition Date, approximately $2,000.00 of Franchise Taxes are accrued and unpaid, and the Debtor seeks

---

[3]     By this Motion, the Debtor is not seeking authorization with respect to certain payroll taxes and withholdings related to the Debtor's employees. Rather, such authorization is sought pursuant to the *First Day Motion of Debtor For an Order Authorizing: (A) Payment of Prepetition Employee Wages, Salaries, and Other Compensation; (B) Reimbursement Of Prepetition Employee Business Expenses; (C) Payments For Which Prepetition Payroll and Tax Deductions Were Made; (D) Payment to Third Parties of All Costs and Expenses Incident to The Foregoing Payments and Contributions; and (E) Applicable Banks and Other Financial Institutions To Honor and Pay All Checks and Transfers Drawn on The Debtor's Payroll Accounts To Make The Foregoing Payments* (the "Employee Wage Motion"), filed contemporaneously herewith.

33409171.8

authority, but not direction, to pay any Franchise Taxes that come due during this Case, whether or not attributable to the prepetition period.

56.     In the ordinary course of business, certain Taxing Authorities in jurisdictions where the Debtor's operations are located are granted the authority to levy property taxes against the Debtor's personal property (collectively, the "Personal Property Taxes").  The Debtor believes that it is current on all Personal Property Taxes as of the Petition Date.  However, to the extent that any Personal Property Taxes were accrued but not paid prior to the Petition Date, and the Debtor seeks authority and discretion to pay any Personal Property Taxes that come due during this Case, whether or not attributable to the prepetition period.

57.     Laws and regulations in jurisdictions in which the Debtor operates require the Debtor to pay fees (collectively, the "Regulatory and Licensing Fees") to obtain a range of licenses and permits from a number of different governmental units.  The methods for calculating amounts due for such licenses and permits, and the deadlines for paying such amounts, vary by jurisdiction.  The Debtor believes that it is current on all Regulatory and Licensing Fees incurred as part of normal operations.  However, to the extent that any such fees were accrued but not paid prior to the Petition Date, the Debtor requests authority and discretion to pay such amounts as they come due in the ordinary course of business.

58.     In the ordinary course of business, the Debtor may collect, withhold, or incur other miscellaneous taxes, fees, or charges, all as determined by the particular state within which the Debtor operates (collectively, the "Other Taxes"). The Debtor believes that it is substantially current on its obligations with respect to Other Taxes.   However, out of an abundance of caution, the Debtor requests authority, but not direction, to pay Other Taxes that are due or become due and payable during this Case, whether such Other Taxes relate to the pre or postpetition period.

59.     In connection with the normal operation of its business, the Debtor incurs and collects Personal Property Taxes, Regulatory and Licensing Fees, Other Taxes, and (collectively referred to herein as "Taxes," as defined above).   These Taxes are paid to the Taxing Authorities on a periodic basis (generally monthly, quarterly, or annually), depending on the particular tax.

60.     In the ordinary course of business, the Debtor from time to time undergoes audits and reviews conducted by the various Taxing Authorities.   While the estimates set forth herein and in the Taxes Motion are based on the Debtor's good-faith assessment of such amounts due on a prepetition basis, there is a possibility that, because of such audits, one or more of the various Taxing Authorities may at some later date assess additional Taxes.   Accordingly, by the Taxes Motion, the Debtor also requests authority, but not direction, to pay any

such undisputed amounts that are later determined to be due and owing on a postpetition basis, including any interest and penalties imposed by any Taxing Authorities with respect thereto.

61.     If any of the Taxes remain unpaid, the Debtor's officers may be subject to lawsuits or even criminal prosecution.   Such proceedings would constitute a significant distraction for the officers at a time when they should be focused on the Debtor's efforts to stabilize its postpetition business operations and develop and implement a successful restructuring strategy.   Moreover, some of the Taxing Authorities may cause the Debtor to be audited if the Taxes are not paid promptly.   Such audits would further divert attention and resources from the reorganization process.   Finally, non-payment of the Taxes and fees may jeopardize the Debtor's ability to maintain the necessary permits to conduct business in certain states and localities.   Uninterrupted business operations are necessary for the Debtor to maintain the proper cash flows in order to restructure its businesses.

62.     The Debtor has sufficient cash to promptly pay all of its obligations for the Taxes and fees in the ordinary course of its businesses, based on the Debtor's general operating revenues.   Based on the foregoing, the Debtor believes that the estate will not be materially harmed if the Court permits the Taxes and fees to be paid.

63.     The Debtor believes that the estate will not be materially harmed if the Court permits the Debtor to pay the relevant Taxes and fees.

## VI.     <u>Conclusion</u>

For all of the reasons stated herein, I believe that the approval of the First Day Pleadings is in the best interest of the Debtor, its estate, its creditors, and all parties in interest.

*[Remainder of page intentionally left blank; signature page to follow]*

Pursuant to 28 U.S.C. § 1746, I declare to the best of my knowledge, under penalty of perjury, that the above statements are true and correct.

April 16, 2024                    **INTERACTIVE HEALTH BENEFITS LLC**

                                  */s/ Todd Covert*
                                  By: Todd Covert
                                  Its: Chief Executive Officer and Sole Member